UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Julie Delgado-O'Neil,

       Plaintiff,

  v.

City of Minneapolis,

    Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 08-4924(MJD/JJK)

_____

     Jill Clark, Jill Clark P.A., Attorney at Law, Counsel for Plaintiff.

     Susan E. Ellingstad and David D. Leishman, Lockridge Grindal Nauen P.L.L.P., Counsel for Defendant.

_____

     Before the Court is Plaintiff's motion for partial summary judgment and the motions of Defendant City of Minneapolis ("City") to exclude Plaintiff's expert report and for summary judgment.

## I.    Introduction

     Plaintiff is Hispanic, and is a current employee at the Minneapolis City Attorney's Office, serving as an Assistant City Attorney I. In 2001, City Attorney Jay Heffern instituted an oral examination as part of a promotional process from the Attorney I position to the Attorney II position. Plaintiff took the oral

1

examination for such promotion in 2001, 2005 and 2007. Plaintiff scored at or near the bottom of the list of those candidates that also took the exam those years. (Ellingstad Aff., Exs. 59-61.) Because only those candidates with the three highest scores were then interviewed[1], Plaintiff has not been promoted to the Attorney II position. (Id. Ex. 57.)

After the oral examination results were determined in 2001, a number of attorney's in the City Attorney's Office filed a formal grievance on the basis that the examination was not reasonably related to the essential functions or the typical duties performed by an Attorney II. (Clark Decl., Ex. 3.) The grievance also noted that the examination did not take into consideration the qualifications of the candidates, or their performance evaluations. (Id.) The grievance did not, however, complain of any adverse impacts based on race.

It wasn't until March 2006 that Plaintiff formally filed a charge of discrimination. In the charge filed on March 6, 2006 with the EEOC and the Minnesota Department of Human Rights ("MDHR"), Plaintiff alleged disparate

---

[1]Pursuant to state law, when a vacancy in the City of Minneapolis is to be filled by promotion, only the first three persons from the appropriate list of eligible candidates is submitted to the hiring manager. See Act of March 22, 1978, ch. 511-H.F. No. 2047 *reprinted in* LAWS OF MINNESOTA FOR 1978 ch. 511 at 130. (Ellingstad Aff., Ex. 14.) This law is referred to as "The Rule of Three."

impact and disparate treatment race discrimination. (Ellingstad Aff., Exs. 65-66.)

On March 9, 2007, Plaintiff filed another charge, claiming retaliation. (Id. Ex. 67.)

Plaintiff then filed this action in August 2008, alleging race discrimination and retaliation in violation of Title VII, the Minneapolis Civil Rights Ordinance ("MCRO") and 42 U.S.C. § 1981. Thereafter, in 2009, the current City Attorney, Susan Segal, created four supervising attorney positions in the Criminal Division. Segal and Deputy City Attorney Martha Holton Dimick interviewed sixteen candidates and selected four for promotion in April 2009. Plaintiff applied, but was not selected for this promotion. (Segal Aff. ¶¶ 2-8.) Plaintiff then filed additional charges with the EEOC, and also filed a separate action against the City and City Attorney Segal, asserting claims under 42 U.S.C. § 1983. That action was consolidated with this action, and by Order dated January 20, 2010, this Court dismissed the Section 1983 claims pursuant to Fed. R. Civ. P. 12(b)(6). The remaining claims in this action are for retaliation and disparate impact under Title VII, MCRO § 130.40 (m)(1) and (3) and 42 U.S.C. § 1981.[2]

---

[2]In her Answers to Interrogatories, Plaintiff made clear that she was not asserting a disparate treatment claim. (Ellingstad Aff., Ex. 13.)

### A.     Plaintiff's Employment History

Plaintiff was hired by the City in 1997 in the Criminal Division and is

currently assigned to the trial team.  (Declaration of Julie Delgado-O'Neil ¶ 2.)

Plaintiff asserts that a few days before her probationary period was to expire in

January 1998, she complained to her supervisor that she had been sexually

harassed by a female co-worker.  (Id.)  Three days later, she was given a form that

extended her probationary period.  Prior to that time, Plaintiff had not been

aware of any performance issues.  (Id. ¶ 4.)

In March 1998, Plaintiff's supervisor received a complaint that Plaintiff had

been rude and aggressive to a Hennepin County clerk, causing the clerk to cry

and run out of the courtroom.  (Ellingstad Aff., Ex. 16.)  Plaintiff asserts that the

Union protested the complaint, and that management eventually backed down.

The letter remained in her file, however.  (Delgado-O'Neil Decl. ¶ 5.)

In October 1998, the City received a letter from a police officer who was

upset with the manner in which a case was resolved.  (Ellingstad Aff., Ex. 17.)

The officer was upset that Plaintiff continued the case without a plea prior to

talking with the officer.  The officer was also upset because Plaintiff was rude and

unpleasant.  (Id.)  Plaintiff states that she dismissed the case because the

defendant was claiming racial profiling. She further states that the officer, when speaking with Plaintiff in the hallway, became irate and reached for his gun. (Delgado-O'Neil Decl. ¶ 6.)

In December 2000, the City was notified that Plaintiff had continued a hearing in a traffic matter that involved a fatality to allow the defense attorney to "judge shop." Prior to agreeing to the continuance, Plaintiff had been notified that the parents of the deceased victim were going to attend the hearing, and that they would be driving up from Iowa. Plaintiff nonetheless continued the matter before the parents arrived at the courtroom. (Ellingstad Aff., Ex. 18.)

In March 2002, the City received another complaint about the Plaintiff - this time from the Violations Bureau. (Id. Ex. 19 (Voicemail from Susan Beaty).) Plaintiff had gone to the Violations Bureau on March 15 and 18, 2002, to negotiate a lower payment on a parking ticket. Plaintiff was reportedly rude and obnoxious to the clerk in the hearing office, and two of the hearing officers, Doug Olson and Susan Beaty. (Id. Ex. 20.) Ultimately, the City determined that Plaintiff's conduct at the Violations Bureau violated Minneapolis Civil Service Commission Rule 11.03B(10) "discourtesy to public or fellow employees." Plaintiff was suspended for six days due to this violation. (Id. Ex. 22.) Plaintiff

filed a grievance with the Union, and the grievance was sustained because it was determined that, while Plaintiff may have been rude, she was operating on her own time when such conduct occurred. (Id. Ex. 23.)

As discussed previously, Plaintiff took the oral examination in 2001 for the Attorney II position, but did not score high enough to be considered for the position. In 2003, Plaintiff again applied for the Attorney II position, but later withdrew her application because she didn't trust the process and because she heard a rumor that the City Attorney had already pre-selected those attorneys to be promoted. (Delgado-O'Neil Decl. ¶ 5.)

In August 2003, the City received a complaint from the maintenance supervisor at St. Olaf's Church, Steven Nallick. (Id. Exs. 24 and 25.) According to Nallick, Plaintiff was improperly parking in St. Olaf's parking lot. Several notes were left on her car informing her she couldn't park in the lot, but she kept doing so. On one particular day, Nallick had called to have her car towed, but before the tow truck left with her car, Plaintiff arrived at the lot. The tow truck driver agreed to not tow the car if Plaintiff paid the $50 drop fee. Plaintiff claimed not to have the money with her, so Nallick agreed to pay the drop fee upon Plaintiff's assurances that she would immediately repay him. According to Nallick,

Plaintiff did not repay him for the drop fee. (Id.) The City conducted an investigation into the complaint, and determined that the matter be closed as there was insufficient evidence that Plaintiff had violated a City rule, policy or procedure. (Id. Ex. 25.)

Plaintiff initially complained that the investigation concerning the St. Olaf's lot was discriminatory. (Id., Ex. 64.) Plaintiff alleges that Nallick had left several messages trying to contact Plaintiff personally, and Plaintiff reported to HR representative Carlos that Nallick was harassing her. It is Plaintiff's position that rather than take her concerns seriously, the City instead investigated Plaintiff. (Delgado-O'Neil Decl. ¶¶ 8-9.)

In July 2004, Plaintiff filed to run for a judgeship. Plaintiff alleges that City Attorney Heffern was not happy about her decision to run. In support, Plaintiff cites to a memorandum Heffern sent to her which simply informed her that pursuant to Section 13.03, Subd. 5 of the applicable Collective Bargaining Agreement, Plaintiff should either take a leave of absence without pay, or vacation time, for the 30 days prior to the election. (Delgado-O'Neil Decl., Ex. Q.)

In February 2005, the Plaintiff was arrested for shoplifting at a Cub Foods store. Security cameras recorded the Plaintiff moving to an empty aisle and

placing some items in her purse, then leaving the store without paying for them. (Ellingstad Aff., Ex. 28.) Ultimately, the criminal matter was continued without a plea. (Id. Ex. 1 (Delgado-O'Neil Dep. at 164).) Plaintiff did not report the arrest to the City until months later, after another employee threatened to report it. (Id., Ex. 2 (Banwer Dep. at 41-42).) Plaintiff stated that on the night in question, she was ill and put some items in her purse because they were falling out of her cart. She was on her way back into the store to pay for the items when she was approached by the store security personnel. A co-worker of Plaintiff's, Judd Gushwa, testified that the store security tape was consistent with Plaintiff's explanation. (Delgado-O'Neil Decl., Ex. gg (Gushwa Dep. at 92).) After an investigation into this matter, Plaintiff was found to have violated Minneapolis Civil Service Commission Rule 11.03 B. 13 - Misconduct - Criminal or dishonest conduct unbecoming to a public employee. Plaintiff was suspended for two weeks, which was reduced to one week pursuant to her Union grievance. (Ellingstad Aff., Ex. 29; Delgado-O'Neil Decl. ¶ 18.)

In June 2005, Plaintiff again applied for an Attorney II position and took the oral examination. She again did not receive a score high enough for her to be considered for the position. (Ellingstad Aff., Ex. 60.)

On March 9, 2006, Plaintiff filed a charge of discrimination with the EEOC and the MDHR.  (Id., Ex. 65.)  In this charge, Plaintiff alleged that she was discriminated against on the basis of Age, National Origin, Race, Color and Creed as evidenced by the fact that she had not been promoted to the Attorney II position, and that she had been subjected to demeaning comments and disciplinary investigations.  Plaintiff also alleged that the oral examinations for the Attorney II position have an adverse impact on race.  Plaintiff further alleged that the 2005 oral exam was postponed to allow two white candidates to prepare for the examination.  (Id.)

On March 9, 2007, Plaintiff filed another discrimination charge with the EEOC, alleging that the City Attorney did not select Plaintiff for the liaison position with the 3rd Precinct in retaliation for her engaging in protected activity - the filing of her discrimination charges in March 2006.  (Id., Ex. 67.)  This charge was eventually dismissed, however, as Plaintiff failed to respond to the Minneapolis Department of Civil Rights' ("MDCR") request for a written response to the City's position statement.  (Id., Ex. 72.)

In April 2007, Plaintiff received a poor performance evaluation.  (Id., Ex. 51.)  Plaintiff responded to this evaluation in a detailed manner. (Delgado-O'Neil

Decl., Ex. U.)  She did not receive a response, however.  (Id. ¶ 23.)

Thereafter, in June 2007, the City received an email from a Hennepin County Public Defender.  Counsel was upset because Plaintiff had dismissed one of his client's cases without notifying him or the defendant ahead of time.  The defendant had taken off a day from work in order to appear for his criminal case, only to learn on the day of trial that Plaintiff had dismissed the case two weeks earlier.  Counsel concluded his email with the following:

> Please be advised that given the long history of her behavior and this most recent transgression, I will no longer deal with [Plaintiff] on any case other then [sic] on the record before a Judge.  I will no longer attempt to negotiate settlements for my clients with her if she is the Pre-Trial attorney. If I am put in that position I will attempt, within the rules, to circumvent the City Attorney's office's wishes by negotiating with the Court or set everything for trial.  I didn't come to this decision lightly and I have bent over backwards to put up with her nonsense for a long time.  Frankly, we all have.  But I draw the line here.

(Ellingstad Aff., Ex. 32.)

In August 2008, Plaintiff filed the instant action.  In September 2008, Plaintiff was coached by her supervisor concerning complaints against Plaintiff - specifically concerning the manner in which Plaintiff treats staff and concerning a Stearns County matter in which Plaintiff was representing a client in a private, civil matter, yet she identified herself as an assistant city attorney and that she

faxed documents using the city's fax machine.  (Id., Ex. 41.)  At the end of the coaching session, Plaintiff informed her supervisor that she did not intend to change her behavior as she did not believe she had done anything wrong.  (Id.)

In October 2008, Plaintiff's supervisor received a complaint from a file room clerk.  Plaintiff was verbally reprimanded for treating this staff person rudely and for throwing a file on her desk.  (Id. Ex. 43.)

Plaintiff was thereafter coached concerning a complaint the City received from a Minneapolis police officer in December 2008.  The officer stated that he had never suffered such grief in a case in his seven year career, and that Plaintiff had a terrible attitude and was very rude.  (Id. Ex. 44.)

On November 25, 2008, an article appeared in the Star Tribune about Plaintiff's case.  On that same day, Plaintiff alleges that City Attorney Segal verbally reprimanded the Plaintiff in her office about an email issue that had taken place months earlier.  (Delgado-O'Neil Decl., Ex. S.)  In a memo dated December 4, 2008, Segal denied that she spoke loudly or harshly with Plaintiff, and that she did not verbally reprimand her.  (Ellingstad Aff., Ex. 68.)  Segal stated that the purpose of talking with Plaintiff on November 25, 2008 was to discuss an inappropriate email exchange with another employee.  (Id.)  She also

addressed whether she was retaliating against Plaintiff, stating that she respected Plaintiff's right to file a lawsuit.  (Id.)

## II.     Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  This burden can be met "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## III.    Section 1981 Claim

Plaintiff alleges that the City discriminated against her in the formation and enforcement of contracts in violation of 42 U.S.C. § 1981.  "A federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to

§ 1983." Artis v. Francis Howell N. Band Booster Ass'n, Inc., 161 F.3d 1178, 1181

(8th Cir. 1998) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989)). "A

claim brought against a municipality under § 1983 is sustainable only if a

constitutional violation has been committed pursuant to an official custom,

policy, or practice of the city, or is so pervasive among non-policymaking

employees of the municipality so as to constitute a custom or usage with the force

of law." Chism v. Curtner, No. 2:07CV00104, 2009 WL 1850195, at *4 (E.D. Ark.

June 25, 2009) (citing Granda v. City of St. Louis, 472 F.3d 565, 568 (8th Cir.

2007)).

As noted above, this Court has already dismissed Plaintiff's § 1983 claim,

as Plaintiff failed to plead any facts from which to infer the City had a custom or

policy of retaliating against its employees. (Report and Recommendation [Doc.

No. 33] at 25; Order [Doc. No. 51] adopting Report and Recommendation.)

Plaintiff argues that the Supreme Court has ruled that a retaliation claim is

actionable under 42 U.S.C. § 1981. CBOCS West, Inc. v. Humphries, 553 U.S. 442

(2008) (recognizing that § 1981 encompasses retaliation claims). CBOCS did not

involve a state actor, however. Where the employer is a state actor, as is the case

here, a retaliation claim under § 1981 must be brought pursuant to 42 U.S.C. §

1983.  See, e.g., Williams v. Dakota County Bd. of Comm'rs, No. 8:09CV201, 2010 WL 964699, at *2 (D. Neb. March 10, 2010) (court recognized that § 1981 claims against a public employer must be asserted through § 1983).

Because Plaintiff has not properly asserted a claim under § 1981, and because this Court has already dismissed Plaintiff's § 1983 claims, the § 1981 claim will be dismissed.

## IV.     Retaliation under Title VII and the MCRO

To establish a prima facie case of retaliation, Plaintiff must show: that she engaged in statutorily protected conduct; a reasonable person would have perceived the alleged retaliatory action to be materially adverse; and a causal connection exists between participation in the protected activity and the adverse employment action.  Sutherland v. Mo. Dep't. of Corr., 580 F.3d 748, 752 (8th Cir. 2009).  Claims under the MCRO are analyzed using the same standard set forth for Title VII claims.  Veliz v. City of Minneapolis, Civ. No. 07-2376, 2008 WL 2622966, at *4 (D. Minn. July 2, 2008) (citing Huggins v. Pechiney Plastics Packaging, Inc., No. A05-255, 2005 WL 3527248, at *2 (Minn. Ct. App. Dec. 27, 2005)).

To constitute an adverse employment action for purposes of a retaliation claim, such adverse action must be considered material - that is such action would have dissuaded a reasonable worker from engaging in the protected activity. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). The Court must keep in mind, however, that "Title VII . . . does not set forth 'a general civility code for the American workplace.'" Id. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. In deciding whether an adverse action is material, such action must be looked at in context. Id. "'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical act performed.'" Id. at 69 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-81 (1998)).

If Plaintiff establishes a prima facie case of retaliation, the burden then shifts to the City to produce a legitimate, non-retaliatory reason for its employment actions. The burden then shifts back to Plaintiff to prove that the City's stated reasons are a pretext for discrimination. Clegg v. Arkansas Dept. of

Corr., 496 F.3d 922, 928 (8th Cir. 2007) (court noted that the McDonnell Douglas framework was to be used to analyze the plaintiff's retaliation claim). To prove pretext, Plaintiff must both discredit the City's asserted reasons for its employment actions and show the circumstances permit drawing a reasonable inference that the real reason for the City's employment decisions was retaliation. Gilbert v. Des Moines Area Comm. College, 495 F.3d 906, 918 (8th Cir. 2007).

### A. Liaison Position

Plaintiff claims that in retaliation for filing an EEOC charge in March 2006, the City did not appoint her the liaison attorney to the 3rd Precinct in September 2006. This claim was also the subject of Plaintiff's March 9, 2007 EEOC charge. (Id. Ex. 67.) Such charge was dismissed, however, as Plaintiff did not respond to the MDCR request for a response. (Id. Ex. 72.)

Title VII "establishes an administrative procedure which a complaining employee must follow before filing a lawsuit in federal court." Briley v. Carlin, 172 F.3d 567, 571 (8th Cir. 1999) (quoting Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994)). "In order to exhaust administrative remedies, the claimant is required to demonstrate good faith participation in the administrative process, which includes making specific charges and providing

information necessary to the investigation." Id.  Where the claimant fails to

respond to agency requests for information or otherwise participate in the agency

investigation, the claimant has failed to exhaust the available administrative

remedies and dismissal is appropriate.  Adair v. Broadlawns Med. Ctr., 102 F.

Supp. 2d 1092, 1097 (S.D. Iowa 1999) (listing cases).

Here, it is clear that Plaintiff abandoned her administrative charge

concerning the liaison position.  Accordingly, to the extent Plaintiff asserts a

claim for retaliation concerning the liaison position, such claim must be

dismissed.

Even if not barred for failure to exhaust administrative remedies, this claim

would be dismissed.  The liaison position does not provide a pay raise or change

in pay grade, seniority or supervisory authority.  Rather, it is just an assignment

in which the same work is performed in one of the City's five precincts.

(Ellingstad Aff., Ex. 71.)  Plaintiff has thus failed to assert a prima facie case of

retaliation, because failure to assign Plaintiff the liaison position is not a material

adverse employment action.  See Jones v. Fitzgerald, 285 F.3d 705, 713 (8th Cir.

2002) (finding that a lateral transfer is generally not considered a material

adverse employment action).

**B.      Excessive Discipline and Negative Performance Evaluations**

Plaintiff also claims that she was subjected to excessive discipline in retaliation for her ongoing complaints of discrimination.  Evidence has been submitted showing that Plaintiff was verbally reprimanded twice and received two coaching sessions.  (Ellingstad Aff., Exs. 25, 43, 41 and 44.)  Plaintiff does not allege, and no evidence suggests, that such discipline resulted in any adverse consequences, such as a demotion or loss of job responsibility.  In the context of a retaliation claim, verbal reprimands or coaching alone do not constitute the type of significant harm that would deter a reasonable employee from engaging in protected activity.  Devin v. Schwan's Home Service, Inc., 491 F.3d 778, 786 (8th Cir. 2007) (plaintiff's claims that she was unfairly issued a written notice for various performance issues did not cause the type of harm that would deter a reasonable person from engaging in protected activity).

Plaintiff was also suspended in 2005 after being arrested and charged with shoplifting.  Plaintiff has failed to demonstrate a causal connection between this suspension and any protected activity, however.  As noted, the suspension occurred in 2005, while her first EEO charge was not filed until March 2006.  Where the protected activity occurs prior to the alleged adverse employment

18

action, "there is no inference of causal connection." <u>Devin</u>, 491 F.3d at 786.

Plaintiff also asserts that she was given poor performance evaluations in retaliation for her complaints of discrimination. There is no evidence, however, that such evaluations were used to detrimentally alter the terms or conditions of her employment. <u>Spears v. Mo. Dep't of Corr. & Human Res.</u>, 210 F.3d 850, 854 (8th Cir. 2000). <u>See</u> <u>also</u> <u>Clegg</u>, 496 F.3d at 929 (finding that claims of failure to provide training and orientation, denying access to needed employment tools, failure to reinstate to prior position, interfering with plaintiff's authority, unfairly adding negative reports and reprimands to personnel file, treating plaintiff differently than coworkers, excluding plaintiffs from meetings, giving plaintiff a negative evaluation, and denying her training do not establish adverse employment actions with respect to retaliation claim).

As Plaintiff has failed to establish a prima facie case of retaliation with respect to her allegations of excessive discipline and poor performance reviews, the City is entitled to summary judgment.

### C.     2009 Supervisor Position

Finally, Plaintiff claims that she was not promoted to a supervisor position in 2009 as retaliation for filing complaints of discrimination. In support, Plaintiff

asserts that City Attorney Segal verbally reprimanded Plaintiff for an inappropriate email in November 2008 - the same day a newspaper article was published concerning her discrimination claims. (Ellingstad Aff., Ex. 1 (Delgado-O'Neil Dep. at 218-20).) When the supervisory positions were filled in April 2009, she was not selected for promotion.

The City argues that this claim fails because Plaintiff cannot demonstrate a causal link between her complaints of alleged discrimination and the decision by City Attorney Segal and Deputy Holton Domick not to promote her. The City asserts that the 2009 supervisor promotions were awarded several months after Plaintiff filed her first action in federal court. There is thus no temporal connection between the two events. The City argues that a time interval of two months between protected activity and an adverse employment action, standing alone, has been found to not support a retaliation claim. Weger v. City of Ladue, 500 F.3d 710, 727 (8th Cir. 2007).

Even if the Court finds that Plaintiff has shown a prima facie case of retaliation, the City has articulated legitimate reasons for the decision not to promote Plaintiff to a supervisor position.

Segal articulated that Plaintiff was not promoted because she was aware of

a long history of complaints about Plaintiff, and that such complaints informed her decision.  (Segal Aff ¶ 3; Ellingstad Aff., Ex. 5 (Segal Dep. at 60, 67-68, 72-76).)  In addition, one month after Segal became City Attorney, a file room employee, who is African American, complained that Plaintiff made disrespectful and racially motivated comments to her when looking for a file.  (Segal Aff. ¶ 4.)  Then, less than a month later, Segal was informed of two new complaints from file room staff about rude and disrespectful treatment by Plaintiff.  (Id. ¶ 5.)  Also, a Hennepin County Judge had reported to Segal that she was not impressed with Plaintiff's prosecutorial skills.  (Id. ¶ 7.)   Segal asserts that these incidents, as well Plaintiff's general performance throughout her tenure with the City Attorney's Office, influenced her decision that Plaintiff was not one of the best qualified candidates for promotion.  (Id. ¶ 8.)

It is Plaintiff's position that she can show pretext through evidence that similarly situated white employees were treated differently.  As to the promotional opportunity to a supervisor position in 2009, however, Plaintiff points to no such evidence.  Specifically, Plaintiff makes no effort to demonstrate that any of the four individuals who were promoted in 2009 had similar complaints made about them, but were promoted anyway.

Even if she had provided evidence that others similarly situated were treated differently, Plaintiff must also discredit the City's asserted reasons for failing to promote her in order to meet her burden of demonstrating pretext. Gilbert, 495 F.3d at 918. In an attempt to explain why others perceive her as rude, Plaintiff asserts that she was not born in Minnesota and therefore it is likely that she is not considered to be "Minnesota Nice." She further asserts that it is not uncommon that people from other cultures attract the "Minnesota Nice Police." (Plaintiff Brief in Opp. To Def. Motion for S.J. at 24.) Plaintiff further asserts that she has a hearing problem, which causes her to speak loudly and to appear to be ignoring people when in fact she hasn't heard them. (Delgado-O'Neil Decl. ¶ 29.) Plaintiff argues she requested a reasonable accommodation for her hearing problem - which was to ask that people not talk to her around doors or walls, where they cannot make eye contact with her, and that she may have to have things repeated or that she be allowed to ask questions. (Id., Ex. Z)

In response, the City asserts that Plaintiff did not disclose her hearing impairment until August 10, 2009, in her written response to her latest performance evaluation. (Affidavit of Martha Holton Dimick ¶ 3.) The City met with Plaintiff concerning her hearing impairment on August 25, 2009, and

requested that Plaintiff provide medical documentation. (Id. ¶ 5.) During that meeting, the City asserts that the only accommodation Plaintiff requested was that people be informed of her hearing problem. (Id.) An email memorializing this meeting was sent to Plaintiff on September 3, 2009. (Id., Ex. A.) In a letter dated February 19, 2010, the City again requested medical documentation concerning Plaintiff's hearing impairment. (Id., Ex. C.) The City asserts that to date, Plaintiff has yet to provide any medical documentation concerning her hearing impairment. (Id. ¶ 9.)

The Court finds that Plaintiff has failed to show that there are genuine issues of material fact that the City's articulated reason for not promoting her in 2009 was a pretext for discrimination. The Court has thoroughly reviewed the Plaintiff's declaration, and the supporting exhibits, and finds that Plaintiff failed to submit any evidence which discredits the reports that Plaintiff treated administrative staff rudely and disrespectfully, and in one case, with racial animus. Not surprisingly, Plaintiff provided no authority to support her position that people not born and raised in Minnesota should be, or are, judged by a different standard. Further, on this record, there is no medical documentation supporting her claim that she is hearing impaired. Accordingly, the Court finds

that the City is entitled to summary judgment on Plaintiff's claim of retaliation

concerning the 2009 supervisor position.

**V.     Disparate Impact Claim**

**A.     Plaintiff's Motion for Spoliation Sanctions**

The district court may impose sanctions for spoliation of evidence

pursuant to its inherent authority.  Dillon v. Nissan Motor Co., Ltd, 986 F.2d 263,

266 (8th Cir. 1993).  A sanction for destruction of evidence is only appropriate

against a litigant where the litigant knew or should have known of the relevance

of the evidence, and the opposing party is prejudiced by the destruction of such

evidence.  Id.

Plaintiff asserts that she filed her initial discrimination charge in March

2006.  After this date, Plaintiff alleges the City destroyed the documents relating

to the 2003 oral exam.  The City's HR representative testified that he had some of

the 2003 documents in his own file, but that the City's file was destroyed.  (Clark

Decl., Ex. 15 (Carlos Dep. at 40-42).)  As a result, Plaintiff asserts that the City has

not produced evidence showing which individuals took the 2003 oral

examination and the results of such examination and that the lack of such

evidence has impeded her investigation of the oral examination process.

24

(Delgado-O'Neil Decl. ¶ 9.)

Plaintiff further asserts that during the investigation of her discrimination charge of March 2006, the MDCR interviewed Assistant City Attorney E.S. (Clark Decl., Ex. 10.) E.S. told the investigator that she is a member of the Minnesota Chippewa tribe, and that she had applied for the Attorney II promotion in 2003. (Id.) Based on this interview, Plaintiff included E.S. in a chart as a person of color that took the oral exam in 2003, that was prepared for use by her expert. (Delgado-O'Neil Decl. ¶ 9.) Plaintiff also recalls that E.S. took the 2003 oral exam, and that E.S. told Plaintiff that she had in fact taken the exam in 2003. Id.

Discovery in this case ended on January 1, 2010. On January 15, 2010, the parties exchanged expert disclosures. Thereafter, the City forwarded to Plaintiff an affidavit from E.S. in which E.S. stated that she had not taken the 2003 oral exam. (Clark Decl., Ex. 11.) At that time, Plaintiff asserts it was too late to take her deposition and too late to file a motion to ask permission to take her deposition.

On March 3, 2010, Plaintiff's expert, David Adams, was deposed in Philadelphia. During the deposition, Adams was questioned about the fact that E.S. should not be included in the statistical analysis for 2003. During the

deposition, the City utilized an exhibit which purports to be a sign-in sheet for the 2003 exam in which there is a blank time slot, and a name other than E.S.'s. (Id. Ex. 2.)   Plaintiff challenges the accuracy of this document.

As a remedy for the alleged spoliation of evidence, Plaintiff asks that the City not be allowed to use the affidavit of E.S. or otherwise benefit from the destruction of the 2003 oral exam documents.

The City asserts that contrary to Plaintiff's assertions, there is no evidence that the 2003 oral exam documentation was destroyed after Plaintiff filed a discrimination charge in 2006.  Rather, the documents were most likely destroyed prior to the filing of the charge, pursuant to the City's document retention procedures.  (Ellingstad Aff. [Doc. No. 97], Ex. A (Carlos Dep. at 40).) Nonetheless, the City asserts that Plaintiff was not prejudiced by the destruction of the HR file, as the City's HR representative Archie Carlos also maintained a file with documents relevant to the 2003 oral examination.  (Id. 41-42.)  In fact, the only documents that are missing are the applications and letters notifying the applicants of their exam time slots.  (Id. at 42.)

The City further argues that Plaintiff has presented no evidence to support the allegation that the City tampered with the sign in sheet to remove E.S.'s

name.  The City's May 21, 2007 response to the MDCR contains the same list of 12

candidates for the 2003 exam.  (Id. Ex. W.)  E.S. has signed an oath attesting to the

fact that she did not take the oral exam in 2003.  In fact, E.S. never explicitly

stated during the MDCR investigation that she took the exam in 2003, she instead

stated she applied for the Attorney II promotion in 2001, 2003 and 2005.  (Clark

Decl., Ex. 10.)  The City states that it did not obtain an affidavit from E.S. until

after it received Plaintiff's expert report - in which Adams conducted statistical

analyses by assuming E.S. had taken the exam - because prior to that time the

City was not on notice that E.S. would be included in the number of persons

taking the 2003 oral exam.

The Court finds that the record does not support a finding that spoliation

sanctions are appropriate as Plaintiff has not demonstrated prejudice.  With

regard to the 2003 oral examination, the City was able to produce the score

reports and the original sign-in sheet, and neither of these documents indicates

that E.S. participated in that examination.  (Id., Exs. O and U.)  The City also

produced an email sent to the applicants, notifying them of when the exam

would take place, and E.S.'s name is not included in the email recipient list.  (Id.

Ex. V.)  Because there is sufficient evidence in the record of which individuals

took the 2003 oral exam, Plaintiff is not prejudiced by the fact that one of the files containing the 2003 oral exam documentation was destroyed. The motion for spoliation sanctions will therefore be denied.

### B.    Plaintiff's Motion to Exclude the City's Expert

Plaintiff moves to exclude the validation study conducted by the City's expert under both <u>Daubert</u> and Rule 702 of the Federal Rules of Evidence. Plaintiff challenges the study on the bases that it was conducted after this litigation commenced and because it is built on false and unreliable facts.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>., the Supreme Court set forth the standard for the admission of scientific expert testimony. 509 U.S. 579 (1993). The Court also provided some general observations for the lower courts to consider in making determinations as to whether the scientific knowledge is relevant and reliable, such as whether it has been tested, subjected to peer review

and publication, what is the known or potential rate of error, and whether it is generally accepted.  Id. at 593-595.

The City retained Dr. Daniel Biddle to perform a statistical analysis and a validation study of the oral examinations for the Attorney II position.  With regard to the validation study, Dr. Biddle used a stratified-random sampling technique to select "job experts" who were asked to participate in the job analysis and the validation process.  (Affidavit of Dr. Daniel Biddle ¶ 2, Ex. 1 ("Biddle Report").)  The job experts selected were either Assistant City Attorney II's, former Attorney II's or supervisors of Attorney II's.  (Id.)  The Biddle Consulting Group ("BCG") collected documents provided by the City, conducted telephone interviews and collected data using a variety of data collection tools in order to conduct the study.  (Id. ¶ 3.)  The job experts then reviewed a list of job duties and the knowledge, skills and abilities ("KSA's") for the Attorney II position based on research conducted by the BCG.  Following such review, modifications were made to the list of duties and KSA's.  (Id., Ex. 1 at 17.)  Thereafter, the job experts rated the duties and KSA's, and determined the frequency with which the duty was performed and the importance level of each duty.  (Id. at 18.)  The job experts also rated the frequency with which the KSA was applied and the

importance level of the KSA.  (Id. at 19.)  The job experts also were asked to link the interview questions with the KSA (Id. at 23.)  The study concluded that the KSA's are related to critical or important duties performed by an Attorney II and that the interview questions were linked to one or more KSA.  (Id. at 27.)  The study also concluded that "high scores during the interview were likely to reflect better potential performance on the job, therefore justifying ranking of job candidates based on their scores."  (Id. at 28.)  Ultimately, the study concluded that the oral examinations for the Attorney II position were content valid and consistent with business necessity.  (Id. at 28.)

First, Plaintiff asserts that the oral exams were not developed utilizing the Uniform Guidelines.  In addition, the oral exam was not written to test the KSA's of the applicants.  Rather, Plaintiff asserts the oral exams were written to avoid knowledge and skills and to cater to the favorites who had been pre-selected. (Delgado-O'Neil Decl. ¶ 15; Gushwa Dep. at 125.)

Plaintiff further argues that the Biddle Report relied on evaluations of the oral examination questions from 2001-2005, provided by a number of Attorney II's.  Plaintiff asserts such individuals are not neutral or disinterested test-takers. Plaintiff also asserts that the questions were developed and selected by City

Attorney Jay Heffern.  In support, Plaintiff points to the deposition testimony of Archie Carlos in which he testified that he and the City Attorney would sit down and discuss competencies to be tested.  (Clark Decl., Ex. 15 (Carlos Dep. at 30).) Plaintiff also challenges the City's expert reliance on the fact that at the end of each interview, the interviewers would record their ratings.  Plaintiff argues that in actuality, the interviewers used pencil initially, and then changed the ratings in pen only after they all met together.  (Id. at 77-78.)  Plaintiff also challenges whether the quality of the candidate's response was determined based on the extent or degree that the response contained relevant information.  Plaintiff asserts that in reality, persons were pre-selected and the questions were directed towards those specific persons.  (Gushwa Dep. at 125.)  Plaintiff further asserts that the City never tested alternatives, and that test scores that utilize a rank ordering component require a separate validation study.

The City responds that its expert provided a comprehensive validation study which concluded that the structured oral exams are consistent with business necessity and satisfy the Uniform Guidelines on Employee Selection Procedures.  The City further asserts that there is nothing suspect about a validation study conducted as part of litigation.  (Biddle Aff. ¶ 6.)  In addition,

neither the Uniform Guidelines nor the Civil Rights Act require onsite visits.  <u>See</u>

<u>generally</u> 29 C.F.R. § 1607.14.  The City also notes that the ranking component of

the oral exam was validated by its expert, and that a separate validation study is

not required.  (Biddle Aff. ¶ 9.)  29 CFR § 1607.14(C)(9).

The Court finds that Plaintiff has not presented any expert testimony to

rebut the City's validation study, nor does Plaintiff challenge the qualifications of

Dr. Biddle or the reliability of this methodology or analysis.  Instead, she relies on

her subjective belief that certain attorneys were pre-selected for promotion, that

the City Attorney designed the questions for those favorites, and that pencil was

used to rate the candidates so the interviewers could change their ranking.  To

successfully challenge the validation study, however, Plaintiff was required to

submit expert testimony or other objective evidence that tended to refute the

findings in said study.  <u>See</u> <u>Firefighter's Institute for Racial Equality ex rel.</u>

<u>Anderson v. City of St. Louis</u>, 220 F.3d 898, 904 (8th Cir. 2000) (rejecting challenge

to validation study, in part, because plaintiff did not present expert testimony or

any other evidence to refute defendant's evidence).  As Plaintiff failed to present

such evidence, her motion to exclude the City's validation study must be denied.

**C.     Agency Determination**

In her motion for partial summary judgment, Plaintiff asks that the Court consider the MDCR Determination when analyzing her disparate impact claim. With respect to Plaintiff's first charge of discrimination filed in March 2006, the MDCR determined that Plaintiff had demonstrated that minority candidates were being promoted at a rate of 26.3% compared to white candidates, which is less than one-third of the 80% required by the four-fifths rule. (Clark Aff., Ex. 7 (MDCR Determination at 24).) The MDCR further considered the City's business necessity explanation - that the oral exam was needed to in order for the City to comply with the Rule of Three. The MDCR determined that there may be better ways to comply with the Rule of Three - such as performance reviews and seniority, court-room success, interviews and other factors. Id. The MDCR determined that Plaintiff had thus demonstrated probable cause that the oral exams had a disparate impact based on race. Id.

It is within the district court's discretion to admit EEOC determinations. Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309 (8th Cir. 1984). Plaintiff asserts that the MDCR investigation preceding its probable cause determination was extensive and largely based on undisputed facts. Plaintiff asserts that the MDCR determination is particularly relevant to Plaintiff's

Minneapolis Ordinance claim.

Contrary to Plaintiff's assertions, the MDCR Determination was based on a preliminary inquiry.  (Clark Decl., Ex. 7 at 1.)  Following a probable cause finding, the Director is to use conciliation and persuasion to resolve the situation.  Minneapolis Code of Ordinances ("MCO") § 141.50(f).  Only if conciliation is unsuccessful does the matter proceed to a full adversarial hearing.  Id. § 141.50(i)-(m).  A hearing was never held and a final decision was never reached in this case because Plaintiff withdrew her charge and proceeded in this Court.  In fact, the MDCR did not even include the results from the 2007 exam.

Because the MDCR Determination was based only on preliminary findings, the Court will not take such determination into consideration.

### D.    Disparate Impact - Prima Facie Case

"Disparate impact claims under Title VII challenge 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'"  Mems v. City of St. Paul et al., 224 F.3d 735, 740 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993)).  The elements of a prima facie case of disparate impact are: 1) a facially-neutral personnel policy or practice; 2) a

disparate effect of such policy or practice on members of a protected group; and 3) a causal connection between the two. Id. With respect to causation, a "plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988). The statistical disparities must be substantial, in that they raise the inference of causation. Id. at 995. In addition, the Court need not presume the plaintiff's statistical evidence is reliable. Id.

If a plaintiff establishes a prima facie case, the defendant has the burden of producing evidence that its employment practices are based on legitimate business reasons. Id. at 996. The burden of proof then shifts back to plaintiff to "show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest . . " Id. Both parties have moved for summary judgment as to Plaintiff's disparate impact claim.

### 1. Facially Neutral Policy

The City argues that the facially neutral policy at issue here is the oral examination that was used to create an eligibility list for the Attorney II position. Plaintiff, on the other hand, identifies the facially neutral policy as the

promotional process as a whole.  Plaintiff thus argues it is appropriate to group the data for all promotional opportunities from 2001 through 2009.  The promotional process has component parts, including: qualifications for the Attorney II position, the creation and structure of the oral exam, the oral exam itself, the ranking of employees and the interview by the hiring party.  Plaintiff further asserts that as the pay differential between the Attorney I and II positions is great, the Court can take such facts into consideration.  With regard to the 2009 supervisor promotions, Plaintiff argues that the City admitted that Attorney I's really did not have a chance for promotion, thus the list of available candidates for the 2009 supervisor promotion was limited to those candidates that ranked high on the oral exam.  Other than this assertion in her brief, Plaintiff cites to no evidence the City made such an admission.

To state a prima facie case of disparate impact discrimination, Plaintiff must identify a specific test, requirement or practice that has an adverse impact on race.  See Smith v. City of Jackson, Miss., 544 U.S. 228, 229 (2005).  It is not enough to assert that an employer generally does not promote persons of color. (Id.) (finding that it is not enough to assert that generally, the employer's pay plan was less generous to older workers).

Because of the requirement that Plaintiff identify a specific employment practice that has an adverse impact, the Court will focus only on the oral examinations given for the Attorney II position, rather than consider the promotional process as a whole.

## 2. Disparate Effect of Such Policy/Causation

In support of her disparate impact claim, Plaintiff submitted an expert report from The Center for Forensic Economic Studies, in Philadelphia, Pennsylvania ("Report"). (Ellingstad Aff. [Doc. No. 68], Ex. 1.) The Report was prepared by three economists: Pia DiGirolamo, Ph.D, James Markham, Ph.D., and David Adams. (Id., Appx. A.) Adams was deposed with regard to the Report. (Id., Ex. 2 (Adams Dep.).)

In the Report, the experts were asked to analyze promotions from 2001-2009 and the promotions for the Attorney II positions for the years 2001, 2003, 2005 and 2007. (Id., Ex. 1 at 3 and 4.) In Table D, the experts looked at the data for the promotions in 2001-2007 - that were based on the results of oral examinations. During his deposition, Adams admitted that the tables included in the Report were inaccurate as he had the wrong number for whites not promoted. (Id., Ex. 2 (Adams Dep. at 91).) Further, as discussed above, the

Report also included E.S. in the number of minorities not promoted in 2003. As the record is clear that E.S. did not take the exam in 2003, the number of minorities not promoted must be reduced from 17 to 16. After using the correct data, Adams calculated that minorities were promoted at a rate less than 80% of whites. He also calculated the probability of 2 minority promotions, or p-value, to be .0568, and the cumulative probability of two or less minority selections, or p-value, to be .0710. (Id., Ex. 3 (Table D1).)

The City has also submitted an expert report in support of its motion for summary judgment. (Ellingstad Aff. [Doc. No. 72], Ex. 11 (Job Analysis and Content Validity Report of a Structured Oral Interview) ("Biddle Report").) Using a Multiple Events Exact Probability Test, the City's expert concluded that for the years 2001-2007, the p-value was .095. (Id. Ex. 11 at 7.) Using the Fisher Exact test, the p-value for the years 2001-2007 was determined to be .088. (Id.)

The City moves to exclude the Report submitted by Plaintiff, arguing that it is not reliable under Rule 702 of the Federal Rules of Evidence and Daubert. Further, the City argues that Adams does not have the qualifications necessary to render an opinion on the adverse impact in employment testing, and that the methods used are based on invalid and unreliable methods, which are

misapplied and not supported by the data.

The Court need not address the City's motion to exclude, however, because even if the Court admits the Plaintiff's expert report, and viewing the data in Plaintiff's favor - that is aggregating the data for all minorities and all test years - Plaintiff has failed to establish the existence of genuine issues of material fact that the oral examinations had a statistically significant adverse impact based on race.

The 80% or four-fifths rule is used to determine whether an employment practice has an adverse impact. Mems, 224 F.3d at 740. "Under the Rule, if members of a protected class are selected at a rate of less than four-fifths (or eighty percent) of the most selected group, the selection rate is evidence of a disparate impact." Id. A showing that this Rule is violated alone, however, is not sufficient to establish a prima facie case. The Supreme Court has recognized the four-fifths rule as only a guideline or rule of thumb. Watson, 487 U.S. at 995, n.3. See also, Kohn v. City of Minneapolis, 583 N.W.2d 7, 13 (Minn. Ct. App. 1998) (finding that the four-fifths rule is not binding law); Paige v. Cal., 223 Fed. Appx. 646, 649 n. 3 (9th Cir. 2007) (concluding that district court's emphasis on statistics over the four-fifths rule not clearly erroneous); E.E.O.C. v. Joint Apprenticeship Comm. of the Joint Indust. Bd., 164 F.3d 89, 97 (2nd Cir. 1998)

(recognizing that four-fifths rule not binding on all courts); <u>Langlie v. Onan</u>

<u>Corp.</u>, 192 F.3d 1137, 1141 (8th Cir. 1999) (court addressed disparate impact

claims without reference to the four-fifths rule); <u>Arthur v. Coll. of St. Benedict</u>,

174 F. Supp.2d 968, 980 (D. Minn. 2001) (same). <u>See</u> <u>also</u> <u>Mems</u> 224 F.3d at 740

(while recognizing the four-fifths rule as a means to indicate an adverse impact,

the court further held that even where the four-fifths rule is violated, "differences

in selection rates may not constitute an adverse impact where the sample size is

too small to be statistically significant."). It is thus not enough that Plaintiff's

expert opined that minorities were promoted at a rate less than 80% of whites.

Recognizing that courts have required more than a showing that the four-

fifths rule was violated, Plaintiff did submit a statistical analysis. (Pl. Brief in

Support of Motion for Partial S.J. at 22.) The City's expert also conducted a

statistical analyses, and both experts agreed that the standard for finding

statistical significance is a p-value (probability value) of .05 or less (a 1 in 20

chance that the event occurred by chance). (Ellingstad Aff. [Doc. No. 72], Ex. 12

(Adverse Impact and Test Validation at 6); Ex. 9 (Report at 3).) In fact, in the

Report, Plaintiff's experts state that "[a] probability (p-value) of .05% or less is

*required* to show a statistically significant disparate impact." (<u>Id.</u>, Ex. 9 at 3.)

(emphasis added.)  Courts have also adopted the .05 probability value when analyzing disparate impact claims.  See, e.g.,Mozee v. Am. Commercial Marine Serv. Co., 940 F.2d 1036, 1043 n.7 (7th Cir. 1991); Palmer v. Shultz, 815 F.2d 84, 92 (D.C.Cir. 1987); Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. 393, 407 (S.D. Ohio 1985); Schechner v. CBS Broadcasting, Inc., No. C 08-05049, 2010 WL 2794374, at *7 (N.D. Cal. July 15, 2010).

As noted above, Plaintiff's expert admitted at his deposition that his initial analyses were incorrect as he had used incorrect data.  (Id. [Doc. No. 68]; Ex. 2 (Adams Dep. at 91).)  Once the correct data was utilized, Adams calculated the probability of 2 minority promotions, or p-value, to be .0568, and the cumulative probability of two or less minority selections, or p-value, to be .0710.  (Id., Ex. 2 (Adams Dep. at 98); Ex. 3 (Table D1).)  As Plaintiff has presented no evidence which demonstrates that the oral examinations resulted in a statistically significant adverse impact on minority candidates, her disparate impact claim fails.

### E.    Disparate Impact - Business Necessity

Even if Plaintiff established a prima facie case, the City can defeat her claim

of disparate impact by showing "that the practice at issue is 'related to safe and efficient job performance and is consistent with business necessity.'" <u>Dial</u>, 469 F.3d at 742 (quoting <u>Firefighters Inst. for Racial Equality v. City of St. Louis</u>, 220 F.3d 898, 904 (8th Cir. 2000)).  In addition, the City must prove that the practice is related to the specific job and the required skills.  <u>Id.</u>  One way to meet this burden is by producing a validity study of the employment test at issue.  <u>Id.</u>

The City has submitted such a validity study.  (Ellingstad Aff. [Doc. No. 72], Ex. 11.)  The City's expert gathered data from a sampling of Attorney II's and III's, who reviewed and rated a list of job duties and KSA's identified with the Attorney II position based on the frequency of each duty.  (<u>Id.</u> at 17-18.)  The Attorney III's rated the KSA's as to whether they correlate to the best worker or is a helpful or required qualification.  (<u>Id.</u>, at 18-19.)  The attorneys also linked the KSA's to the interview questions used in each of the four exams and to the related job duties of the Attorney II position.  (<u>Id.</u> at 20, 23.)  The expert concluded, based on this study, that the KSA's were linked to critical or important work duties and each of the interview questions were also linked to one or more important KSA.  (<u>Id.</u> at 27.)

F.      **Disparate Impact - Alternative Practices**

Once the City has met its burden of demonstrating a business necessity for the facial neutral policy at issue, Plaintiff must show there are alternative practices that are as effective in achieving the City's legitimate goals and that have a lesser discriminatory impact. Such alternative practice must be "available, equally valid and less discriminatory." <u>Allen v. City of Chicago</u>, 351 F.3d 306, 312 (7th Cir. 2003). It is Plaintiff's position that the best system to use for Attorney II promotions would be to have all attorneys take the oral exam at the same time, tape record their answers and submit the answer to an anonymous outside evaluator who does not know any of the candidates. (Delgado-O'Neil Dep. at 51-52.) Plaintiff has produced no evidence to support her theory that this alternative would be as valid as the structured exam, that it would result in a different racial impact, or that it is economically feasible. The Court thus finds that even if Plaintiff had established a prima facie case, the City is entitled to summary judgment on her disparate impact claim as she has failed to demonstrate that a valid alternative exists to the City's oral examinations for the Attorney II position.

**IT IS HEREBY ORDERED** that:

1.    The City's Motion for Summary Judgment [Doc. No. 69] is

GRANTED in its entirety.  This matter is hereby dismissed with

prejudice.

2.     The City's Motion to Exclude Plaintiff's Expert Report [Doc. No. 65]

is DENIED as moot.

3.     Plaintiff's Motion for Partial Summary Judgment [Doc. No. 76] is

DENIED.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: August 4, 2010

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court